UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

BEST PAYPHONES, INC.,

        Plaintiff,

v.

ALLAN DOBRIN, former Department of
Information Technology and
Telecommunications (DoITT) Commissioner,
BRUCE REGAL, former DoITT Acting Deputy
Commissioner, STANLEY SHOR, DoITT
Assistant Commissioner, AGOSTINO CANGEMI,
DoITT Deputy Commissioner, DEBRA
SAMUELSON, DoITT Deputy General
Counsel, and THE CITY OF NEW YORK,

        Defendants.

**MEMORANDUM AND ORDER**
01-CV-3934 (LDH) (ST)
01-CV-8506 (LDH) (ST)
03-CV-0192 (LDH) (ST)

---

LASHANN DEARCY HALL, United States District Judge:

Plaintiff Best Payphones, Inc. filed these three consolidated actions against the City of

New York (the "City"), Allan Dobrin, Bruce Regal, Stanley Short, Agostino Cangemi, and

Debra Samuelson alleging First Amendment retaliation and unconstitutional conditions,

violations of the Equal Protection Clause, and a conspiracy in violation of 42 U.S.C. § 1983,

arising from the City's regulation of pay phones.[1]  Plaintiff commenced the first of these actions

by complaint filed June 7, 2001 (ECF No. 1, No. 01-CV-3934), and the operative third amended

complaint was filed on August 20, 2010 (ECF No. 261, No. 03-CV-192.) ("TAC").  On July 29,

2015, Judge Gleeson referred the parties' anticipated cross-motions for summary judgment to

---

[1] A pay phone is "a usually coin-operated telephone."  Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/pay%20phone; "Pay phones. They require an arcane thing called 'change' in order to place a call."  *See* Tanvi Misra, Why Some Places have Plenty of Pay Phones, Citylab, https://www.citylab.com/life/2014/11/why-some-places-still-have-plenty-of-pay-phones/382454/.

Magistrate Judge Scanlon for a report and recommendation. On March 10, 2016, these cases were reassigned to this Court and, on April 7, 2016, the Court referred the anticipated summary-judgment motions to Magistrate Judge Tiscione for a report and recommendation.

On September 13, 2018, Magistrate Judge Tiscione issued a report and recommendation ("R&R"), wherein he recommended that the Court grant summary judgment in favor of Defendants and against Plaintiff with three exceptions. (R&R, ECF No. 534.) *First*, he recommended that Plaintiff's First Amendment retaliation claim arising from Defendants' purported removal of Plaintiff's pay phones, issuance of fines against Plaintiff, and refusal to accept Plaintiff's franchise agreement be permitted to proceed to trial. (*Id.* at 1.) *Second*, he recommended that Plaintiff's unlawful-condition claim be permitted to proceed to trial. (*Id.*) *Third*, Magistrate Judge Tiscione recommended denying Defendants' request for summary judgment with respect to Plaintiff's *Monell* claim, except as to Plaintiff's First Amendment retaliation claim against the City. (*Id.* at 2.)

Both parties filed lengthy objections.[2] Indeed, even a non-party filed an objection.[3] Plaintiff objected that: (1) it was entitled to summary judgment on its unconstitutional-condition

---

[2] Not content with filing a twenty-seven-page objection and a thirty-page response to Defendants' objections, Plaintiff also, without leave, filed a patently untimely reply. (*See* ECF No. 548.) Plaintiff's basis for its untimely reply is that Plaintiff's counsel was on trial. Not only was Plaintiff not permitted to file a reply as of right, the Court finds its explanation for its belated reply unpersuasive. Therefore, the Court did not consider Plaintiff's reply brief. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").

[3] By letter dated February 8, 2019, non-party Richard Marotte filed a letter seeking to interpose his own objections to the R&R. Given Marotte's pro se status, his letter will be construed as a request for leave to file an *amicus curiae* brief. His request, however, is denied. *Concerned Area Residents for Environ. v. Southview Farm*, 834 F. Supp. 1410, 1413 (W.D.N.Y. 1993) ("District Courts have broad discretion in deciding whether to accept *amicus* briefs."). And the circumstances under which an *amicus* brief is considered "desirable" are limited:

> An *amicus* brief should normally be allowed when a party is not represented competently or is not represented at all, when the *amicus* has an interest in some other case that may be affected by the decision in the present case . . . or when the *amicus* has unique information or perspective that can help the court beyond the help that lawyers for the parties are able to provide. Otherwise, leave to file an *amicus* brief should be denied.

claim; (2) Magistrate Judge Tiscione improperly applied a public concern balancing test to its

First Amendment claims; (3) even assuming the public concern balancing test applied, Plaintiff

had adduced evidence that its conduct involved matters of public concern; (4) Magistrate Judge

Tiscione erred in recommending dismissal of its Equal Protection claim; (5) Magistrate Judge

Tiscione erred in recommending dismissal of its *Monell* claim; and (6) Magistrate Judge

Tiscione erred by finding that certain of Defendants actions did not constitute retaliatory animus.

(Best Payphones, Inc.'s Obj. R&R Issued by Mag. Judge Tiscione, Docket No. 534 Filed Sept.

13, 2018, ECF No. 540.)  Defendants objected that:  (1) Plaintiff's unconstitutional-condition

claim was no longer a part of the case; (2) res judicata should have applied based on Plaintiff's

July 2000 Article 78 proceeding; (3) Plaintiff failed to present sufficient evidence of retaliatory

motive to support its First Amendment retaliation claim; (4) Plaintiff's First Amendment

retaliation claims failed to satisfy the public-concern balancing test; and (5) Plaintiff failed to

adduce sufficient evidence to support any claim for compensatory damages.  (Municipal Defs.'

Mem. Supp. R. 72 Obj. ("Defs.' Obj.") at 2-8, ECF No. 542.)

    The Court reviews any portion of the R&R that has been objected to *de novo*.  *See* Fed.

R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(C).  As to the balance, "the district court need only

satisfy itself that there is no clear error on the face of the record."  *Estate of Ellington ex rel.*

*Ellington v. Harbrew Imps. Ltd.*, 812 F. Supp. 2d 186, 189 (E.D.N.Y. 2011) (quoting *Urena v.*

---

*Citizens Against Casino Gambling in Erie County v. Kempthorne*, 471 F. Supp. 2d 295 (W.D.N.Y. 2007) (*quoting Ryan v. Commodity Futures Trading Comm*, 125 F.3d 1062-63 (7th Cir. 1997) (Posner, J.)).  The parties in this matter are represented ably by counsel.  Moreover, Mr. Marotte does not appear to be in possession of any unique information or perspective that would assist the Court.  Instead, Mr. Marotte claims that the Court's decision could impact his own challenge to the City's regulatory scheme for public pay telephones ("PPT").  Further, while Mr. Marotte claims that his case will be affected by the Court's decision, his claims challenging the City's 2013 public bidding process for franchises to install communications hotspots on public sidewalks, which appear to have been dismissed, do not appear to be similar to the First Amendment claims raised here.  *See* Order, *Marotte v. City of New York*, No. 16-CV-8953, ECF No. 135 (S.D.N.Y. March 5, 2019).

*New York*, 160 F. Supp. 2d 606, 609-10 (S.D.N.Y. 2001) (internal quotation marks and citations omitted)).

## BACKGROUND[4]

### I.     The Legislative and Regulatory Backdrop

In September 1995, the New York City Council enacted Local Law 68, establishing new regulations for pay phones.  (R&R at 5.)  Local Law 68 required entities wishing to install and operate pay phones to obtain franchises and permits.  (*Id.*)  Because many pay phone owners had previously operated without such franchises and permits, Local Law 68 provided for an interim registry program to grandfather-in existing pay phone operators.  (*Id.* at 5-6.)  To register pursuant to the interim program, a pay phone owner was required to submit a list of its pay phones to the Department of Information Technology and Telecommunications ("DoITT") and to pay a fee.  (*Id.* at 6.)  The owner could continue operating those pay phones until he or she obtained the necessary franchise and permits, so long as the DoITT Commissioner did not object. (*Id.*)  A grandfathered-in right to operate could be terminated where:  (1) the owner failed to respond to the DoITT Commissioner's solicitation; (2) the DoITT Commissioner determined not to award a franchise to the owner; or (3) the Franchise Concession Review Committee (the "FCRC") decided not to approve a proposed franchise agreement for the owner.  (*Id.*) Complicating the City's regulation of pay phones, in 1996, Congress enacted the Telecommunications Act (the "TCA"), which provided that state and local governments could not prohibit an entity from providing a telecommunications service with the exception that they could "require fair and reasonable compensation from telecommunications providers, on a

---

[4] The following facts are drawn from the undisputed facts identified by Magistrate Judge Tiscione.  Neither party specifically objected to the R&R's statement of facts, with limited exceptions which will be addressed as necessary. The Court has reviewed the basis for the R&R's statement of facts and, finding no clear error, adopts those facts for purposes of this memorandum and order.

competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis." *See* 47 U.S.C. §§ 253(a), (c).

## II.    Plaintiff's Application for a Franchise Agreement

Plaintiff owned unauthorized pay phones at the time that Local Law 68 was enacted. (R&R at 6-7.)  Pursuant to Local Law 68, Plaintiff paid the requisite fees and submitted its registration forms, identifying 839 active pay phones.  (*Id.* at 7.)  On June 19, 1998, DoITT provided Plaintiff with a draft franchise agreement.  (*Id.*)  On July 2, 1999, DoITT mailed a final draft of the franchise agreement to Plaintiff, noting that it was prepared to recommend that FCRC approve the final draft.  (*Id.*)  DoITT also enclosed an acceptance letter which required a countersignature.  (*Id.*)  Plaintiff's owner, Michael Chaite, signed the agreement on July 12, 1999, but included the following disclaimer:  "I . . . am prepared to sign the final agreement prepared by DoITT provided that all the provisions of said final agreement conform to all City, State and Federal laws.  All rights reserved."  (*Id.*; Letter from Plaintiff to DoITT, ECF No. 485-3 at 105.)

On August 11, 1999, the FCRC approved the final format of the franchise agreement (the "FA") and approved DoITT to enter into such agreements with a number of companies, including Plaintiff.  (R&R at 7.)  The FA required operators of curb-line pay phones to pay ten percent of gross revenues, with operators of building-line pay phones to pay a flat fee, both subject to adjustment.  (*Id.*)  Plaintiff received a final form of the FA and closing documents on August 13, 1999.  (*Id.* at 8.)  Plaintiff was required to execute the FA and submit the required closing documents by October 15, 1999.[5]  (*Id.*)  During the fall of 1999, Plaintiff and representatives of DoITT exchanged a number of letters, discussing the deadline applicable to

---

[5] This deadline was later extended to November 15, 1999.  (R&R at 8.)

the FA and Plaintiff's interest in selling his pay phones to a different operator. (*Id.* at 8-9.) By early 2000, Plaintiff had not executed the FA. (*Id.* at 9.) On January 13, 2000, DoITT informed Plaintiff that because it had not executed the FA or submitted the necessary closing documents, Plaintiff's request for a franchise would not be approved. (*Id.* at 10-11.) DoITT further stated that Plaintiff had until March 13, 2000, to: (1) enter into an agreement to sell its pay phones to a franchised pay phone owner; (2) remove its pay phones; or (3) enter into the FA and submit the required documentation. (*Id.* at 11.) DoITT warned Plaintiff that if it failed to comply with one of these alternatives, Plaintiff's pay phones would be subject to removal. (*Id.*)

Following continued discussions between Plaintiff and the City, on March 13, 2000, an attorney for Plaintiff contacted the City to raise several of Plaintiff's objections to the FA and DoITT's process. (*Id.* at 12.) The parties met on March 20, 2000. (*Id.* at 12.) During the meeting, Plaintiff argued that the City was not charging fees in a competitively neutral manner and that the franchise fees were not "fair and reasonable" as required by the TCA. (*See id.* at 13-15.) In a letter provided to the City during the meeting, Plaintiff notified the City that Plaintiff had identified an interested buyer for its business and requested that DoITT provide documentation and information to permit an orderly sale. (*Id.* at 15.)

The City never responded to Plaintiff's requests from the March 20, 2000 meeting. (*Id.* at 16.) Instead, between May 8 and 10, 2000, the City removed twenty-three of Plaintiff's pay phones and issued notices of violations charging $23,000 in fines. (*Id.*) A representative of the City indicated that the City had taken this action to provoke Plaintiff to comply with Local Law 68. (*Id.*)

On May 10, 2000, Plaintiff delivered to the City certain closing documents and an executed FA. (*Id.*) Plaintiff had annotated the agreement to state that its execution was "under

duress caused by the City's actions in removing its payphones . . . and . . . under protest of the City's authority . . . which [Plaintiff] believes to be in violation of certain State and Federal laws." (*Id.*) Plaintiff further stated that its execution of the agreement was not intended to constitute a waiver of any rights to challenge the agreement. (*Id.*) On May 11, 2000, the City informed Plaintiff that it would not receive a franchise so long as Mr. Chaite was Plaintiff's owner. (*Id.*) That same day, the City sent Plaintiff an agreement requiring Plaintiff to acknowledge that it had failed to timely submit the required documents and therefore was not entitled to franchise approval. (*Id.* at 16-17.) The agreement also proposed a means for Plaintiff to sell its pay phones, provided that Plaintiff consent to the removal of five pay phones a week until the sale was completed. (*Id.* at 17.) DoITT maintains that this counteroffer was made because Plaintiff failed to submit the FA by March 13, 2000, unilaterally altered the language of the agreement, and failed to submit the required closing documents. (*Id.*) Plaintiff, on the other hand, maintains that it provided all required documentation. (*Id.*) Plaintiff did not agree to the terms of the counteroffer, but requested that the City not remove any more of its pay phones until Plaintiff was able to sell its business. (*Id.*) Plaintiff threatened legal action if DoITT continued to remove Plaintiff's pay phones. (*Id.*)

In June 2000, Plaintiff contacted DoITT to challenge DoITT's removal of Plaintiff's pay phones without notice. (*Id.* at 17-18.) In response, on June 19, 2000, DoITT Commissioner Dobrin informed Plaintiff that its pay phones were operating in violation of the law. (*Id.* at 18.) On August 4, 2000, Commissioner Dobrin sent Plaintiff a final notice that it was in violation of Local Law 68. (*Id.*) On August 8, 2000, DoITT again contacted Plaintiff, informing it that while its pay phones were subject to removal, DoITT would consider limiting the removal of Plaintiff's pay phones, if Plaintiff provided evidence that it was completing a sale of its business. (*Id.*) In

response, Plaintiff provided a letter of intent by New York City Telecommunications, Inc. to acquire Plaintiff's assets. (*Id.* at 19.)

During the summer and fall of 2000, the parties participated in hearings before the Environmental Control Board (the "ECB") in connection with the $23,000 in fines that the City sought to collect from Plaintiff. (*Id.*) Ultimately, an ECB administrative law judge determined that DoITT lacked the authority to fine Plaintiff, because only the FCRC, and not DoITT, had the authority to approve or disapprove a franchise. (*Id.*)

### III. Litigation between the City and Plaintiff

On April 5, 2000, New Phone, a wholly-owned affiliate of Plaintiff, filed a suit against the City and certain payphone competitors (the "New Phone Litigation"). *See* Compl., *New Phone Company, Inc. v. Indep. Payphone Ass'n of New York*, 00-cv-2007 (E.D.N.Y. Apr. 5, 2000). New Phone alleged that, in violation of the TCA, DoITT had favored its competitors by providing advance notice that it would waive a $59 application fee. This action was dismissed, with the dismissal affirmed by the Second Circuit on December 7, 2009. *See New Phone Company, Inc. v. Indep. Payphone Ass'n of New York*, 355 F. App'x 501, 502-03 (2d Cir. 2009) (summary order).

On July 11, 2000, Plaintiff initiated an Article 78 proceeding against the City to direct DoITT to either: (1) grant Plaintiff a franchise; (2) permit Plaintiff to sell its assets and capital stock; or (3) if needed, permit Plaintiff to reapply for a franchise. (R&R at 20.) The Article 78 proceeding was ultimately dismissed on grounds of statute of limitations and untimely service. *See Best Payphones, Inc. v. Dep't of Info. Tech. & Telecomm.*, 5 N.Y.3d 30, 33-34 (2005). This decision was affirmed by the New York Appellate Division and Court of Appeals. *See Best Payphones, Inc. v. Dep't of Info. Tech. & Telecomm.*, 767 N.Y.S.2d 649, 650 (App. Div. 2003), *aff'd* 5 N.Y.3d 30 (2005).

In the months that followed, the parties continued discussing a means of resolving their dispute. (R&R at 21-22.) DoITT repeatedly stated that it would only consider recommending an FA for Plaintiff or a purchaser of Plaintiff's business, if Plaintiff terminated all of its litigation against the City and executed the FA without any conditions. (*Id.* at 21.) Because Plaintiff would not agree to such terms, DoITT refused to approve any FA or sale. (*Id.*) For example, in February 2001, DoITT indicated to U.S. Telco, a potential purchaser of Plaintiff's assets, that it would not approve a transfer because Plaintiff had not responded to DoITT's settlement proposal. (*Id.* at 22.) In August 2001, Plaintiff informed Universal Telecommunications ("Universal") that Universal's proposed purchase of Plaintiff's assets would not be approved because Universal had failed to pay required franchise fees. (*Id.*)

On August 9, 2001, DoITT demanded that Plaintiff either remove its pay phones or provide DoITT with written evidence that its pay phones were permitted or did not require permits. (*Id.*) Plaintiff did not comply with the August 9, 2001 notice, and on August 23, 2001, DoITT removed another thirty-one of Plaintiff's pay phones, based on thirty-seven notices of violation. (*Id.*) DoITT sought to enforce the notices of violation before the ECB. (*Id.* at 23.) An ECB administrative law judge once again found that DoITT lacked the authority to rescind the FCRC's approval of Plaintiff's franchise application, but that Plaintiff was precluded from asserting this defense because it had not included it in an Article 78 proceeding. (*Id.*) Therefore, the administrative law judge sustained the notices of violation. (*Id.*)

On March 3, 2003, DoITT informed Plaintiff that it would permit Plaintiff to sell its pay phones to BAS Communications, Inc. ("BAS"), which Plaintiff ultimately did. (*Id.*)

**DISCUSSION**

I. **Plaintiff's Unconstitutional Condition Claim**

A. **The TAC States an Unconstitutional Condition Claim**

Under Federal Rule of Civil Procedure 8(a)(2), to state a claim, a plaintiff need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." As the Supreme Court explained in *Skinner v. Switzer*, "a complaint need not pin plaintiff's claim for relief to a precise legal theory. Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires only a plausible short and plain statement of the plaintiff's claim, not an exposition of his legal argument." 562 U.S. 521, 530 (2011).

In this case, the complaint states that the FA "requir[es] any applicant for a payphone franchise to waive its rights to challenge DoITT's actions and City regulations both at the time of being approved for a franchise and prospectively without knowing what rights the City might choose to violate in the future." (TAC ¶ 102.) The complaint continues that the FA "provides in ¶ 2.3(b) that the person signing the agreement has the authority to bind the franchisee and that its attorney certifies that the FA when executed is a binding agreement against the franchisee. This amounts to a waiver of the inalienable right to challenge a mandatory franchise agreement." (*Id.* ¶ 104.) The complaint proceeds to allege that Plaintiff's claims arise under the First Amendment, referring back to these factual allegations, without expressly distinguishing between its retaliation and unconstitutional-condition claims. Plaintiff's "complaint easily satisfies the requirements of Rule 8(a) because it gives [Defendants] fair notice of the basis for [Plaintiff's] claims." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 514 (2002).

Nonetheless, Defendants argue that Plaintiff's unconstitutional-condition claim was removed from the case by Plaintiff's amendment of the Second Amended and Supplemental Complaint (the "Second Amended Complaint"). (Defs.' Obj. at 2-8.) In support, Defendants

point the Court to a comparison between the Second and Third Amended Complaints. (Defs.'

Obj. at 3-5.) Paragraph 102 was amended as follows:[6]

> 102. The FA ~~is further illegal and invalid in its~~ [sic] numerous provisions requiring payment of unreasonable fees and fines imposed by 67 RCNY for violations of ~~legal and illegal~~ regulations, for imposing penalties without adequate concern for rights of ~~procedural due process and~~ equal protection of the laws, for allowing DoITT to take actions, including imposing penalties and promulgating regulations, in a~~n anti-competitive and~~ discriminatory manner and even in retaliation for the exercise of an entity's constitutional rights of free speech and redress of grievances, and for requiring any applicant for a PPT franchise to waive its rights to challenge DoITT's actions and City regulations both at the time of being approved for a franchise and prospectively without knowing what rights the City might choose to violate in the future.

(*Id.* at 3 n.1.) And Paragraph 104 was similarly amended:

> 104. The FA ~~is illegal and invalid, *inter alia*, in that it~~ provides in ¶2.3(b) that the person signing the agreement has the authority to bind the franchisee and that its attorney certifies that the FA when executed is a binding agreement against the franchisee. This amounts to a waiver of the inalienable right to challenge a mandatory franchise agreement and finds its fullest expression in 14.3.2 of the FA and the ancillary documents in the "closing package," whose purpose is to force the franchisee to execute just such a waiver of rights which the Second Circuit has determined cannot be required of a franchisee and would be void even if it were executed.

(*Id.*) Defendants argue that the clear import of these changes is that Plaintiff had withdrawn any First Amendment unconstitutional-condition claim. (*Id.* at 3-4.) Nonsense. If Plaintiff had intended to withdraw its First Amendment unconstitutional-condition claim, it would have additionally excised the portions of these paragraphs explicitly stating that the FA "require[ed] any applicant for a PPT franchise to waive its rights to challenge DoITT's actions and City regulations both at the time of being approved for a franchise and prospectively without knowing what rights the City might choose to violate in the future" and "amounts to a waiver of the inalienable right to challenge a mandatory franchise agreement . . . which the Second Circuit has determined cannot be required of a franchisee and would be void even if it were executed."

---

[6] The stricken through portion of the text indicates text that appeared in the Second Amended Complaint, but did not appear in the TAC.

(TAC, ¶¶ 102, 104.)  Admittedly, it is not patently clear why Plaintiff excised some words and not others from its complaint.  What is clear, however, is that it did not excise the allegations supporting an unconstitutional condition claim.

Defendants further argue that subsequent events confirmed their understanding that no unconstitutional condition claim was stated.  (Defs.' Obj. at 5-8.)  These arguments are even less persuasive.  *First*, Defendants cite an August 16, 2010 order from then-Magistrate Judge Carter in which he directed Plaintiff to make additional changes to ten completely different paragraphs in the complaint.  (*Id.* at 5 n.2.)  The fact that then-Magistrate Judge Carter instructed Plaintiff to change ten other paragraphs does not somehow indicate that the paragraphs cited above no longer state an unconstitutional-condition claim.  *Second*, Defendants argue that Plaintiff's attempt to seek summary judgment in 2013 with respect to this very unconstitutional-condition claim somehow indicates that Plaintiff's complaint no longer states such a claim.  (*Id.* at 5-6.)  Defendants maintain that following Plaintiff's letter request to proceed with a motion for summary judgment regarding this claim, Defendants made the same argument they make now— that Plaintiff did not plead an unconstitutional-condition claim.  (*Id.*)  Rather than moving to briefing on the issue, Plaintiff proposed further amending its complaint.  (ECF No. 348.)  Notably, Plaintiff's proposed amendments did not have anything to do with a First Amendment unconstitutional-condition claim.  (*Id.*)  Instead, Plaintiff proposed amending to restate its claim that the FA violated the TCA.  (*Id.*)  Defendants argue that by proposing to amend to add the TCA claim, "[P]laintiff in effect conceded that defendants were correct in asserting that the claim is not in the case."  (*Id.* at 5-6.)  But the fact that Plaintiff sought to add a TCA claim does not somehow indicate that Plaintiff no longer intended to prosecute a completely different claim.

The simpler and more plausible explanation is that Plaintiff believed the complaint stated an unconstitutional-condition claim and therefore felt no need to further amend its complaint.[7]

### B. The Merits of Plaintiff's Unconstitutional Condition Claim

While the Court finds that Plaintiff's unconstitutional condition claim remains in the case, the Court agrees with Magistrate Judge Tiscione's assessment that the parties failed to properly brief their arguments on the merits of the claim. Courts have applied different levels of scrutiny to such claims depending on the nature of the alleged unconstitutional condition. *Compare Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 550 (1983) (applying rational basis review to an unconstitutional condition challenge), *with F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 395 (1984) (striking down a federal funding restriction based on a First Amendment challenge because the government's "substantial interest" in the restriction could be "fully satisfied by less restrictive means that are readily available"). And neither Plaintiff nor Defendants even address the appropriate level of scrutiny to apply to the scheme at issue. As another court noted in this context, "determining the constitutionality of government subsidization of expression is one of the most frustrating tasks of the First Amendment." *Legal Aid Society of Hawaii v. Legal Servs. Corp.*, 961 F. Supp. 1402, 1412 (D. Haw. 1997) (*quoting* Martin H. Redish and Daryl Kessler, *Government Subsidies and Free Expression*, 80 Minn L. Rev. 543, 544 (1996)). The issue is a complex one, worthy of thorough briefing.

---

[7] Defendants also claim that Plaintiff's reference in the complaint to *TCG New York, Inc. v. City of White Plains*, in which the Second Circuit found a statutory violation of the TCA, but not a First Amendment or unconstitutional-condition violation, indicates that Plaintiff did not state an unconstitutional-condition claim. (Defs.' Obj. at 6.) But the fact that Plaintiff asserts that the FA violates the TCA does not preclude the FA from also violating the First Amendment. Further, Plaintiff appears to rely on the Second Circuit's finding in support of its assertion that Defendants could have no legitimate basis for requiring Plaintiff to enter into an unlawful agreement. (*See* Best Payphones, Inc.'s Response Municipal Defs.' R. 72 Obj. ("Pl.'s Resp.") at 8-10, ECF No. 545.)

The Court also notes that Defendants may have believed, in good faith, that the unconstitutional-condition claim was not part of this case. Indeed, Plaintiff's briefing of the matter, which muddled together the concepts of substantive due process, retaliation, and unconstitutional conditions certainly did not illuminate the issue. While the Court would not normally provide parties an additional bite at the apple, the Court agrees with Magistrate Judge Tiscione that the matter is worthy of proper briefing. Therefore, within thirty days of this memorandum and order, Plaintiff is directed to file a ten-page submission setting forth the appropriate standard for its unconstitutional-condition claim and the undisputed facts in support of that claim, citing only to specific paragraphs of undisputed facts within the parties' 56.1 statements. Defendants are directed to file a ten-page opposition, if any, thirty days following Plaintiff's submission, also citing only to specific paragraphs of undisputed facts within the parties' 56.1 statements. No reply brief shall be permitted. The failure to abide by the Court's instructions with respect to specific citations to 56.1 statements may result in the imposition of sanctions.

## II.    Res Judicata

To demonstrate that a claim is barred under the doctrine of res judicata, "a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the parties or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Pike v. Freeman*, 266 F.3d 78, 91 (2d Cir. 2001) (quoting *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 284–85 (2d Cir. 2000)). Magistrate Judge Tiscione found that Plaintiff's claims were not barred by res judicata because at the time Plaintiff initiated its Article 78 proceeding, it was not necessarily the case that Plaintiff could obtain the same damages as it could in a § 1983 suit, and therefore it could not have raised the same claims. (R&R at 29.) Specifically, in an Article 78 proceeding, a

petitioner may only obtain damages that are "incidental to the primary relief," whereas there is no similar limitation on a § 1983 plaintiff. (*Id.* at 29-32.) Defendants argue that while this may have once been true, New York courts now permit "hybrid" Article 78 proceedings, which may be converted into broader actions. (Defs.' Obj. at 13-15.) Therefore, according to Defendants, because Plaintiff could have brought a hybrid action, but chose not to, its claims are barred.

Magistrate Judge Tiscione thoughtfully considered and rejected Defendants' argument. Specifically, he found that while hybrid proceedings have become more common, in July 2000, when Plaintiff initiated an Article 78 proceeding, they were not. (R&R at 32-33.) Indeed, Magistrate Judge Tiscione noted that such hybrid proceedings are not even available as of right, with New York courts frequently severing or dismissing claims for damages. (*Id.*) Therefore, he concluded, it would be unjust to preclude Plaintiff from raising his claims in federal court on that basis.

In an effort to convince this Court that Magistrate Judge Tiscione's determination was in error, Defendants cite to a number of cases in which courts have permitted hybrid Article 78 proceedings or found such hybrid proceedings to have res judicata effect. (Defs.' Obj. at 13-14.) These cases are not helpful to Defendants. As an initial matter, most of these cases involved Article 78 proceedings occurring far more recently than Plaintiff's July 2000 proceeding. *See O'Dette v. Fisher*, No. 12-cv-2680, 2014 WL 6632470, at *6 (E.D.N.Y. Nov. 21, 2014) (Article 78 proceeding in 2013); *Green Materials of Westchester v. Town of Cortlandt*, No. 15-cv-3257, 2015 WL 9302838, at *2 (S.D.N.Y. Dec. 21, 2015) (Article 78 proceeding in 2012); *Matter of Leadingage N.Y., Inc. v. Shah*, 2014 NY Slip Op 32236(U) (Article 78 proceeding in 2013); *Loehr v. Admin. Bd. of Courts of State*, 13 N.Y.S.3d 260, 261 (App. Div. 2015), *rev'd sub nom. Loehr v. Admin. Bd. of Courts of State of New York*, 79 N.E.3d 1113 (N.Y. 2017) (Article 78

proceeding after December 2013); *Bernstein v. Feiner*, 787 N.Y.S.2d 357, 359 (App. Div. 2004) (Article 78 proceeding after May 2003). Further, the only cases Defendants cite that actually apply res judicata, did so where the plaintiff had, in fact, brought a hybrid Article 78 proceeding. *See, e.g.*, *Green Materials of Westchester v. Town of Cortlandt*, No. 15-cv-3257, 2015 WL 9302838, at *7 (S.D.N.Y. Dec. 21, 2015) (applying res judicata where the plaintiff brought a hybrid proceeding and even sought to amend their Article 78 claim to add the specific claims at issue in the federal action); *Sheffield v. Sheriff of Rockland Cty. Sheriff Dep't*, 393 F. App'x 808, 812 (2d Cir. 2010) (finding res judicata applied where a plaintiff "clearly presented" her federal claims in a hybrid Article 78 proceeding "and the state court adjudicated those claims").[8] Tellingly, Defendants cite no case similar to this one, where a plaintiff did not bring a hybrid action and may not have been able to in the first instance. Under these circumstances, the Court, like Magistrate Judge Tiscione, sees no reason to depart from binding Second Circuit precedent which holds that an Article 78 proceeding does not bar a subsequent civil-rights claim for damages where a plaintiff may have been barred from seeking such damages in the Article 78 proceeding. *See Davidson v. Capuano*, 792 F.2d 275, 282 (2d Cir. 1986).[9]

## III. First Amendment Retaliation Claims

Plaintiff asserts that Defendants retaliated against Plaintiff for exercising its First Amendment rights. Specifically, Plaintiff claims that its challenges to Defendant's FA constituted protected speech and that Defendants retaliated by, among other things, removing

---

[8] Defendants also cite a New York Appellate Division case in which the Appellate Division found that the plaintiff there could not relitigate issues previously decided in a hybrid Article 78 proceeding. *See Yellow Cab of Newburgh, Inc. v. Westchester Cty.*, 898 N.Y.S.2d 659, 661 (N.Y. App. 2010). Such a case has little bearing on this one where Plaintiff indisputably did not raise his § 1983 claims in an Article 78 proceeding.

[9] Defendants argue that *Davidson* is outdated and rests upon premises that no longer comport with New York practice, in that it did not recognize the potential for hybrid cases. Perhaps so, but if the binding precedent of *Davidson* is to be revisited, only the Second Circuit, and not this Court, has the authority to do so.

Plaintiff's pay phones, refusing to permit Plaintiff to sell its assets, and fining Plaintiff. Magistrate Judge Tiscione recommended granting Defendants' summary judgment with respect to some, but not all, of Plaintiff's First Amendment retaliation claims. (R&R at 39-40.) Specifically, Magistrate Judge Tiscione found that: (1) First Amendment retaliation claims made by franchise applicants like Plaintiff are subject to a heightened standard, in that a plaintiff must demonstrate that any protected activity related to a matter of public concern; (2) while Plaintiff's threats to litigate the FA's validity constituted the requisite protected activity relating to a matter of public concern, Plaintiff's Article 78 proceeding and its subsidiary's lawsuit against the City did not; and (3) some, but not all, of the retaliatory conduct alleged by Plaintiff survived summary judgment. (*Id.* at 40-45, 47-56.)

Plaintiff argues that Magistrate Judge Tiscione erred by applying the heightened public concern standard, and contends that even if that standard did apply, Magistrate Judge Tiscione erred by finding that the Article 78 proceeding and subsidiary litigation did not involve matters of public concern. (Pl.'s Obj. at 6-9.) Plaintiff further contends that it adduced sufficient evidence that additional conduct by Defendants was motivated by animus. (*Id.* at 21-25.) Defendants argue that Magistrate Judge Tiscione erred by finding Plaintiff's litigation threats met the public concern test and that Plaintiff had adduced sufficient evidence of any retaliatory motive whatsoever. (Defs.' Obj. at 15-19.)

A. **The Public Concern Test**

Our courts have long recognized that "while the government enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their protected speech." *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir. 2001). Therefore, where a government employee challenges his or her government employer's actions as First

17

Amendment retaliation, "a plaintiff must establish that what he said or did constituted speech on a matter of public concern." *Id.* Further, a court resolving such a claim must balance the government employer's interests against the potential First Amendment concerns using a heightened standard as established in *Pickering*. *Id.* Magistrate Judge Tiscione found that the *Pickering* test should apply here because under some circumstances, Defendants' "interest in establishing fees, rules, and procedures for monetizing public space [could] outweigh a business' right to petition with grievances." (R&R at 43-44.) In other words, in this context, Defendant had "dual interests as a commercial counterparty and as a sovereign." (*Id.* at 44.) The Court finds Magistrate Judge Tiscione's use of the *Pickering* standard was error.

In finding that Magistrate Judge Tiscione's finding was in error, the Court relied on the Second Circuit's opinion in *Wandering Dago, Inc. v. Destito*. 879 F.3d 20 (2d Cir. 2018). In *Wandering Dago*, the Second Circuit found that the *Pickering* standard did not apply to a government agency's refusal to license a food truck. *Id.* at 38. There, a government agency established a licensing program for food vendors to provide food to state employees and other visitors to a government-owned plaza. *Id.* at 26-28. To participate, a vendor was required to pay a fee to the government, and maintain certain insurance and other requirements. *Id.* In return, the government would provide assigned vending locations and access to electricity and water. *Id.* The government did not directly pay the vendors as independent contractors; instead the vendors were able to profit from selling directly to both state employees and members of the public. *Id.* A food truck vendor named "Wandering Dago" applied for a license. *Id.* at 28. The government rejected Wandering Dago's application because it viewed the term "dago" as well as the names of several of Wandering Dago's menu items, to be offensive and derogatory. *Id.* The vendor challenged this determination as a violation of the First Amendment. *Id.* at 29. The

government argued that its rejection of Wandering Dago's application was akin to "conditions placed on a prospective government contractor's speech" and therefore subject to the *Pickering* test. *Id.* at 38. The Second Circuit rejected this argument.[10] *Id.*

As the Second Circuit explained, a license applicant under these circumstances was not similarly situated to "a prospective government contractor." *Id.* This was so because in the cases involving government contractors, "the government agreed to pay public moneys to private individuals for services to be rendered, and therefore had a stronger interest in restricting those individuals' speech than in restricting the speech of the public at large." *Id.* While "the vendors stand to generate revenue for themselves as a result of the arrangement" and the government "indirectly benefits from the goods and services the food vendors provide as part of this exchange . . . that is where the resemblance to government contracting ends." *Id.* The government only provided "access to a forum . . . and modest nonmonetary assistance that facilitates the use of that forum." *Id.* Further, "it is those employees and other private citizens, *not* [the government], that actually pay the food vendors for their goods and services and directly benefit from them." *Id.* Indeed, the Second Circuit highlighted the fact that "[t]he only monetary exchange between the food vendors and [the government] is a fee paid *by* the vendors *to* [the government]." *Id.* (emphasis in original). Therefore, the Second Circuit determined that the food venders could not be viewed "as government contractors, but rather as private entities

---

[10] Magistrate Judge Tiscione applied the *Pickering* test based on his assessment that courts broadly apply the *Pickering* test to any commercial relationship between the government and an entity. (R&R at 44 ("The relationship may go by many names—licensee, franchisee, permit holder, lessor, etc. Regardless, just like the employee-employer relationship, in these situations the government has dual interests as a commercial counterparty and as a sovereign.")). In doing so, he did not distinguish *Wandering Dago*, instead relying on non-binding and out-of-circuit precedent. For example, in *Howard v. City of New York*, the court found that a tennis instructor permitted to teach lessons on public courts failed to demonstrate that his statements related to a matter of public concern as required by *Pickering*. No. 12-cv-933, 2014 WL 84357, at *3 (S.D.N.Y. Jan. 6, 2014). Notably, on appeal, the Second Circuit expressly avoided the question of whether the *Pickering* test applied, determining that the Plaintiff failed to establish causation regardless of the standard. None of these cases, all of which predate *Wandering Dago*, provide the Court with any rationale to depart from binding Second Circuit precedent.

that pay to access public benefits and, in using those benefits to their economic advantage, secondarily satisfy a government purpose." *Id.*

The licensing scheme at issue here is largely indistinguishable. Under the terms of the FA, operators of curb-line pay phones were required to pay the City ten percent of gross revenues, while operators of building-line pay phones were to pay a flat fee. (R&R at 7.) In exchange for these fees, payphone operators were provided access to a forum through which private citizens, and not the government, could pay to utilize pay phones. (*Id*. at 5.) Under these circumstances, the government simply does not have the same interest in limiting a payphone operators' speech as that of a government contractor.

Defendants, apparently conceding that a fair reading of *Wandering Dago* undermines their argument that the *Pickering* test applies, argue that, in deciding *Wandering Dago*, the Second Circuit got it wrong.[11] (Defs.' Obj. at 6-7.) Specifically, Defendants claim that the Second Circuit was not made aware of binding precedent that would have altered its determination. (*Id.*) What *chutzpah*. It should go without saying that, this Court is bound by the Second Circuit's decisions and cannot simply choose to ignore them. More importantly, the authority to which Defendants refer the Court, does not even support Defendants' argument.[12] In *O'Hare Truck Serv., Inc. v. City of Northlake*, the Supreme Court found that government officials could not terminate government contractors for refusing to support a political party or its candidates, unless political affiliation was a reasonably appropriate job requirement. 518 U.S. 712, 714 (1996). Contrary to Defendants' assertions, the Supreme Court did not apply the

---

[11] Defendants also assert that *Wandering Dago* is factually distinguishable but curiously fail to cite any reasons why *Wandering Dago* is distinguishable beyond the vague assertion that there "plaintiff engaged in speech in a public forum provided by government." (Defs.' Obj. at 7.)

[12] Defendants implicitly suggest that, in *Wandering Dago*, the Second Circuit ignored twenty-two-year-old precedent from the Supreme Court.

*Pickering* test, instead expressly remanding the question of whether to apply the *Pickering* test to the lower court.  *Id.* at 726.  *O'Hare* is therefore inapposite.

### B.    Plaintiff's Retaliation Claims

Because the Court finds that the heightened standard of *Pickering* does not apply here, Plaintiff was required to demonstrate only:  "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003).

### 1.    Plaintiff engaged in protected activities.

Plaintiff proffered four purportedly protected activities as the basis for its retaliation claims:  (1) its refusal to accept the FA as written; (2) its acceptance of the FA with a written reservation of rights to later challenge the FA; (3) its Article 78 petition; and (4) the New Phone Litigation.  (Pls' Opp. at 7, 11-12.)  Magistrate Judge Tiscione found that while the first two of these constituted protected activity, the latter two failed to qualify as conduct related to a matter of public concern.  (R&R at 47-53.)  Because the Court finds that the heightened public concern standard does not apply here, this finding was in error.

Our courts have long recognized that "the right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government."  *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 896–97 (1984).  The First Amendment protects the right to initiate traditional litigation, like the New Phone Litigation, but also Article 78 proceedings. *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994).  For this reason, and because Plaintiff need not meet the heightened public concern standard, all four proffered activities constitute protected petitioning.

## 2.    Plaintiff has offered admissible evidence of adverse actions.

Plaintiff alleged nine adverse actions by Defendants:  (1) removing Plaintiff's pay phones in May 2000; (2) refusing to accept Plaintiff's executed FA; (3) refusing to allow Plaintiff to purchase franchise rights from Telco; (4) refusing to allow Plaintiff to sell its assets to Universal; (5) proposing a resolution to retroactively disapprove Plaintiff; (6) refusing to approve the proposed sale of Plaintiff's assets to NYC Public in August 2000; (7) discriminatorily enforcing various rules that resulted in approximately $100,000 in fines; (8) issuing permits to the buyer of Plaintiff's pay phones for pay phones which Defendants would not issue permits to Plaintiff; (9) refusing to ultimately issue an FA to Plaintiff; and (10) removing Plaintiff's pay phones in August 2001.  Magistrate Judge Tiscione found that Plaintiff had adduced sufficient evidence as to six of these actions, but not to the other four.  Specifically, Magistrate Judge Tiscione found that Plaintiff had failed to adduce evidence as to:  (6) the proposed sale of Plaintiff's assets to NYC Public; (7) the $100,000 fines assessed against Plaintiff, (8) the issuance of permits to the purchaser of Plaintiff's pay phones; and (9) the refusal to ultimately issue an FA to Plaintiff. Plaintiff challenges only one of these findings:  the failure to adduce evidence of $100,000 in fines.

Plaintiff apparently concedes that it did not put before Magistrate Judge Tiscione evidence of the fines.  (Pl.'s Obj. at 25.)  Instead, Plaintiff invites this court to review the City's official website and search for itself for the evidence Plaintiff failed to adduce.  (*Id.*)  The Court declines Plaintiff's invitation.

The Second Circuit has found that "[c]onsiderations of efficiency and fairness militate in favor of a full evidentiary submission for the Magistrate Judge's consideration."  *Hynes v. Squillace*, 143 F.3d 653, 656 (2d Cir. 1998).  As such, the Second Circuit has routinely "upheld the exercise of the district court's discretion in refusing to allow supplementation of the record

upon the district court's *de novo* review." *Id.* This is particularly the case where, as here, a party offers no justification for its failure to offer evidence to a magistrate judge. *See Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 894 F.2d 36, 40 n.3 (2d Cir. 1990) (finding that a party "had no right to present further testimony when it offered no justification for not offering the testimony at the hearing before the magistrate"). Plaintiff clearly had the ability, and, given the lengthy course of this litigation, the time, to provide evidence necessary to support this claim. The Court will not countenance Plaintiff's failure to properly do so. Therefore, the Court adopts Magistrate Judge Tiscione's recommendation as to the viable adverse actions upon which Plaintiff may base its retaliation claims.

### 3. Plaintiff has established a sufficient causal connection for certain retaliatory conduct.

Magistrate Judge Tiscione found that Plaintiff had adduced sufficient evidence of a causal connection between only two of the purportedly retaliatory acts which occurred in May 2000: (1) the removal of Plaintiff's pay phones and issuance of fines in May 2000 and (2) the refusal to accept the signed FA. (R&R at 54–65.) Magistrate Judge Tiscione found, however, that Plaintiff had failed to adduce sufficient evidence with respect to Defendants' (1) refusal to permit Plaintiff to purchase franchise rights from U.S. Telco, (2) refusal to permit Plaintiff to sell its assets to Universal, (3) preparation of the FCRC Resolution, and (4) removal of Plaintiff's pay phones in August 2011. (*Id.*) Unsurprisingly, Plaintiff argues that all of its purported bases for retaliatory conduct were causally connected to its protected petitioning (Pl.'s Obj. at 22–25), while Defendants contend that they were not. (Defs.' Obj, at 16–19.) The Court addresses each purported basis in turn.

### a.     Removal of Plaintiff's Pay Phones in May 2000

Magistrate Judge Tiscione found that a reasonable jury could find that the removal of Plaintiff's pay phones on May 8 was substantially motivated by Plaintiff's threats to litigate against Defendants on March 13, March 21, and April 14.  (R&R at 56.)  Magistrate Judge Tiscione's recommendation was based on two factors:  (1) the close temporal proximity between Plaintiff's letters and the pay phones' removal (between four and eight weeks); and (2) the fact that no other payphone operator who failed to meet Defendants' deadline for registration had its pay phones removed.  (R&R at 56–59.)  Defendants argue that reliance on the temporal proximity between Plaintiff's threats and the pay phones' removal alone is insufficient to establish a causal connection and that the comparators identified by Magistrate Judge Tiscione were not similarly situated.  (Defs.' Obj. at 16.)  Defendants' objections are misplaced.

As an initial matter, the Second Circuit has found that temporal proximity alone can suffice at the summary-judgment stage to establish a prima facie claim for First Amendment retaliation.  *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 168 (2d Cir. 2006) ("A plaintiff may establish causation indirectly by showing his speech was closely followed in time by the adverse employment decision.").  And the Second Circuit has found that similar or even longer periods of time to that here can establish the necessary causal connection at the summary-judgment stage.  *See, e.g.*, *Nagle v. Marron*, 663 F.3d 100, 111 (2d Cir. 2011) (six weeks); *Cioffi*, 444 F.3d at 168 (2d Cir. 2006) (several months and several weeks); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 555 (2d Cir. 2001) (four or five months).  Therefore, Magistrate Judge Tiscione did not err in finding that Plaintiff had established a prima facie case of retaliation.

Because Plaintiff established a prima facie case of retaliation, Defendants were required to demonstrate "by a preponderance of the evidence that [they] would have taken the same adverse employment action even in the absence of the protected conduct." *Nagle v. Marron*, 663 F.3d 100, 111–12 (2d Cir. 2011) (internal citation and quotations omitted). That is, Defendants "are entitled to summary judgment if they can show that a reasonable jury would have to find by a preponderance of the evidence that" Defendants would have removed Plaintiff's pay phones regardless of Plaintiff's threatened litigation. *See id.* Even after such a showing is made, Plaintiff can defeat Defendants' motion by demonstrating that the proffered justification is pretextual. *Zehner v. Jordan-Elbridge Bd. of Educ.*, 666 F. App'x 29, 33 (2d Cir. 2016) (finding that a jury should determine whether the defendant's justifications for its actions were merely pretext for retaliation in response to plaintiff's protected conduct.); *Smith v. Cty. of Suffolk*, 776 F.3d 114, 125 (2d Cir. 2015) (precluding summary judgment where the record permitted only inferences that defendant would have taken the same adverse actions against the plaintiff absent plaintiff's protected conduct.).

Defendants attempted to satisfy their burden by producing letters and deposition testimony indicating that the removal of Plaintiff's pay phones was due to Plaintiff's failure to execute the FA by March 13 and that the removal of the pay phones was intended to "provoke some action to comply with the law by Plaintiff." (R&R at 57.) On the other hand, Plaintiff adduced evidence that these stated motivations were pretextual. Specifically, Plaintiff adduced evidence that Defendants did not remove the pay phones of any other payphone operator who had also failed to meet the deadline. (R&R at 58–59.) Indeed, one payphone operator, NYTAS, whose application was ultimately denied on the basis of multiple criminal convictions, including

stealing pay phones from a competitor, was given multiple extensions beyond the initial March 13 deadline.  (R&R at 25.)

Defendants argue that Magistrate Judge Tiscione erred in finding that the proffered comparators, including NYTAS, were sufficiently similar to Plaintiff.  (Defs.' Obj. at 16–18.)  As an initial matter, the standards Defendants cite for the similarity of comparators are imported from the equal protection context and are not necessarily relevant to a First Amendment retaliation claim.  *See Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018) ("To succeed on [an equal protection] claim, plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.").  Moreover, the purported distinction asserted by Defendants—that the comparators "were fully agreeable to signing and accepting the franchise agreement but simply had not done so yet for a variety of a practical reasons"—is simply insufficient at this stage to grant Defendants summary judgment.  (Defs.' Obj. at 16–18.)

Given the evidence adduced by both parties, the court cannot conclude, as Defendants urge that a reasonable juror would necessarily find, that Plaintiff's pay phones would have been removed without regard to Plaintiff's litigation threats.  As the Second Circuit has held in affirming the denial of summary judgment for a First Amendment retaliation claim, "the evidence of record before us permits only inferences.  Those inferences may be drawn in either party's favor, and we require more than inferences." *Smith v. Cty. of Suffolk*, 776 F.3d 114, 125 (2d Cir. 2015).  Plaintiff's claim arising from the May 2000 removal of its pay phones therefore survives summary judgment.[13]

---

[13] Defendants further object that its actions with respect to NYTAS were reasonable given ongoing litigation related to a different payphone operator.  (Defs.' Obj. at 17–19.)  While these fact-bound arguments may ultimately persuade a jury that Defendant's decisions with respect to Plaintiff were not pretextual, it is not appropriate for the Court to resolve such disputes at this stage.

Magistrate Judge Tiscione also found that Plaintiff had presented a triable issue of fact with respect to a retaliation claim based on Defendants' refusal to accept Plaintiff's signed FA in May 2000.  (R&R at 60–63.)  Plaintiff adduced evidence that it delivered the signed FA with a reservation of its rights to litigate the FA's validity on May 10, 2000.  (*Id.* at 60.)  The following day, DoITT rejected the FA by faxing Plaintiff an agreement requiring that it sell its phones to another company, acknowledge that it had lost its rights to a franchise by failing to meet the deadline, and acquiesce to the removal of its pay phones until a sale was completed.  (*Id.*)  Defendants argued that it would have rejected the FA regardless of Plaintiff's reservation of rights because:  (1) Plaintiff submitted the FA after the March 13, 2000 deadline, (2) the FA did not contain the required closing documents, and (3) the FA's reservation of rights constituted a counter-offer instead of an acceptance.  (*Id.*)  Here again, Magistrate Judge Tiscione determined that a reasonable jury could find that these purported motivations were pretext.  *First*, Magistrate Judge Tiscione noted evidence in the record that Defendants accepted at least three other executed FAs after the May 10 deadline.  (*Id.* at 60–61.)  Further, Defendant Regal, an attorney from the corporation counsel's office who represented DoITT, conceded during his deposition that Defendants were willing to accept Plaintiff's application after the March 10 deadline.  (*Id.*)  *Second*, the parties dispute whether the FA package was incomplete, Plaintiff never received notice that its package was incomplete, and other applicants who had filed incomplete packages were ultimately still approved.  (*Id.* at 61.)  *Third*, Magistrate Judge Tiscione found that Defendants willingness to continue discussions with Plaintiff even after Plaintiff's reservation of rights, undermined Defendants' claim that it was this unwillingness that led Defendants to reject the FA.  (*Id.* at 62.)

Defendants do not dispute that Plaintiff adduced sufficient evidence of pretext with respect to Defendants' first two proffered motivations. (Defs.' Obj. at 18-19.) Instead, Defendants argue that Magistrate Judge Scanlon previously found that Plaintiff's alteration of the FA did not constitute acceptance of the FA, but a counteroffer, and Defendants' refusal to accept Plaintiff's counteroffer therefore cannot be considered retaliatory. (*Id.*). Defendants' argument simply does not follow. Defendants are correct that Magistrate Judge Scanlon, in recommending that Plaintiff's application for leave to amend the complaint be denied, found that Plaintiff did not validly execute the FA because "Plaintiff's unilateral changes to that agreement's terms do not constitute an acceptance of the City's offer." *Best Payphones, Inc. v. City of New York*, 2015 U.S. Dist. LEXIS 174901, *58. But whether Plaintiff's executed FA is termed an accepted offer or a counter-offer, Defendants refusal to accept the FA still may constitute an adverse action that was motivated by retaliatory intent. An adverse action, in the context of a First Amendment retaliation claim, is "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006). Plaintiff alleges, and has adduced evidence demonstrating, that Defendants refused to enter into the FA based on Plaintiff's protected threats to litigate the validity of the FA. The refusal of a government agency to enter into a potentially lucrative agreement with a private business could certainly deter similarly situated businesses from exercising their right to petition. Therefore, Defendants cannot defeat this claim at summary judgment.

ii.     *Defendant's Refusal to Allow Plaintiff to Purchase U.S. Telco's Franchise Rights*

Magistrate Judge Tiscione determined that no reasonable jury could find that Defendants' refusal to permit Plaintiff to purchase franchise rights from U.S. Telco was retaliatory animus because such a claim was based not on protected activity related to a matter of public concern,

but to private concerns. (R&R at 63–64.) Specifically, in a letter dated December 5, 2000, Regal indicated that DoITT would not approve Plaintiff's purchase of an existing franchise unless it terminated, with prejudice, its Article 78 proceeding and the New Phone Litigation. (*See* Letter from Regal to Sobel, Dkt. No. 485-4 at 182 (Dec. 5, 2000). Then, in a February 2, 2001 letter to U.S. Telco, Regal indicated that any transfer of U.S. Telco's franchise to Plaintiff would require FCRC approval, and implied that DoITT would not recommend approval to the FCRC unless Plaintiff complied with the demands in the December 5, 2000 letter. (*See* Letter from Regal to U.S. Telco, Inc., Dkt. No. 485-4 at 190 (Feb. 2, 2001)).

Because Magistrate Judge Tiscione applied the *Pickering* test to Plaintiff's claims, he erred in finding that neither the Article 78 proceeding nor the New Phone Litigation could constitute protected conduct. Properly construed, Regal's express statement that Defendants would not permit Plaintiff to purchase U.S. Telco's franchise rights unless it ceased to engage in protected conduct constitutes prima facie evidence of a First Amendment retaliation claim. Defendants have proffered evidence, however, of a non-retaliatory motive. Specifically, Defendants claim that while their letters indicated an initial settlement position, Defendants did not actively refuse to approve of a deal between Plaintiff and U.S. Telco, and instead the proposed transaction simply never occurred. (Def.'s Mem. Supp. Mot. Summ. J. ("Defs.' Mem.") at 26.) Neither party has adduced sufficient evidence for the Court to determine as a matter of law whether Defendants' actions caused the proposed deal between Plaintiff and U.S. Telco to fail. Therefore, drawing inferences in favor of Plaintiff as the non-moving party with respect to these claims, a reasonable jury could find that Defendants' proffered motivations were pretextual. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur*, 892 F.2d 199, 205 (2d Cir.

1989) ("Questions of intent, we note, are usually inappropriate for disposition on summary judgment.").

> iii. *Defendant's Refusal to Allow Plaintiff to Sell its Assets to Universal*

Magistrate Judge Tiscione found that no reasonable jury could conclude that Defendants refused to allow Plaintiff to sell its assets to Universal, because "Plaintiff does not cite to any evidence in the record to support this contention." (R&R at 64.) Contrary to Magistrate Judge Tiscione's finding, however, Plaintiff did adduce evidence that Defendants refused to allow Plaintiff to sell its assets to Universal. In an April 1, 2015 declaration, Plaintiff's owner, Mr. Chaite, stated that during an October 23, 2011 meeting, Cangemi and Regal informed Plaintiff and Universal that Plaintiff would need to dismiss all litigation against the City or else Defendants would not approve of the proposed agreement between Plaintiff and Universal. (Decl. Michael Chaite Opp'n Defs.' Mot. Summ. J., ("Chaite Decl.") ¶ 63, ECF No. 486-2.) Moreover, Mr. Chaite claims that Cangemi and Regal stated that this condition would apply to any proposed purchaser of Plaintiff's pay phones. (*Id.* ¶ 64.) In other words, Plaintiff has adduced admissible evidence demonstrating that Defendants expressly stated that they would not approve of a transaction with Universal unless Plaintiff ceased from engaging in protected activity. This constitutes a prima facie case of First Amendment retaliation. At the same time, however, Defendants have proffered evidence indicating that the City's determination not to approve of a transaction between Plaintiff and Universal was based on the fact that Universal had failed to pay its own franchise fees, as well as Defendants' concerns with Universal's financial state. (*See* Def. ECF No. 485-4, 235–36.) Once again, where both parties have proffered evidence in support of their claims, the Court cannot find as a matter of law that Plaintiff could not prove retaliatory intent. *See Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984) ("[W]here

subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable."). Therefore, summary judgment is inappropriate with respect to this claim.

*iv.*     *The Preparation of the FCRC Resolution*

Following an ECB determination that DoITT lacked the authority to determine that Plaintiff had lost the FCRC's approval for a franchise, on December 18, 2011, DoITT prepared a resolution for the FCRC to deny Plaintiff a franchise. (R&R at 19.) The memorandum enclosing the proposed resolution indicated that Defendants sought the resolution because "Plaintiff refused to accept the franchise agreement terms approved by the FCRC and failed to execute and deliver the agreement by the deadline set." (ECF No. 492-6, *2-3.) Magistrate Judge Tiscione found that Plaintiff failed to adduce any evidence that the proposed resolution was motivated by retaliatory animus. (R&R at 64.) Instead, Magistrate Judge Tiscione found that Defendants had demonstrated a valid motivation for the resolution: the ECB's determination that DoITT lacked unilateral authority to rescind the FCRC's franchise approval for Plaintiff. (*Id.*) Magistrate Judge Tiscione erred, however, by ignoring the repeated and sustained course of events reflected in the record.

At the time Defendants prepared the resolution at issue, Plaintiff's Article 78 proceeding was still on appeal and the New Phone Litigation was still pending.[14] Moreover, Plaintiff has adduced evidence that while other applicants had failed to execute the FA by the deadline, no resolution was sought for any other applicant. (*See* Samuelson Decl., ¶¶ 71-72, Exhibits UU and VV.) A reasonable jury could find that Defendants only prepared the FCRC resolution given Plaintiff's insistence on continuing to engage in protected litigation activity. Defendants, in

---

[14] Magistrate Judge Tiscione's finding may have been influenced by his conclusion that the Article 78 proceeding and New Phone Litigation did not constitute protected activity.

opposition, point out a non-retaliatory motivation for preparing the FCRC resolution: that the ECB had ruled that DoITT lacked the authority to determine that Plaintiff should be denied a franchise. (Defs.' Resp. at 19.) Further, Defendants argue that such a resolution was not necessary for any other entity because no other entity had challenged DoITT's authority to deny franchise approval. (*Id.*) In short, the parties have presented disputed facts from which a reasonable jury could find for either party. Therefore, summary judgment on this claim must be denied.

v.  *The Removal of Plaintiff's Pay Phones in August 2001*

On August 9, 2001, after the dismissal of Plaintiff's Article 78 petition, but while the New Phone Litigation was still pending, DoITT sent a letter to Plaintiff demanding that Plaintiff remove its remaining pay phones from City property or provide DoITT with written evidence that its pay phones were permitted or did not require permits. (R&R at 22.) Following Plaintiff's failure to comply, DoITT removed 31 additional pay phones and issued another 37 NOVs. (*Id.*) Magistrate Judge Tiscione found that, because this conduct occurred more than fifteen months after the last instance of Plaintiff's protected conduct (i.e. its reservation of rights in the FA), no reasonable jury could find that the removal of pay phones and issuance of NOVs were motivated by retaliatory animus. This finding, however, was based on the erroneous determination that the Article 78 proceeding and New Phone Litigation were not protected conduct. Because both litigations were protected conduct, this subsequent removal took place temporally proximate to this conduct: less than one month after the dismissal of Plaintiff's Article 78 proceeding and while the New Phone Litigation was still pending. A reasonable juror could readily find that DoITT's additional removal of pay phones and issuance of NOVs was continued retaliation for Plaintiff's protected litigation. While Defendants contend that DoITT's

removal of Plaintiff's pay phones was simply DOITT's enforcement of its own laws, as with the FCRC Resolution claim, this claim presents issues of disputed facts and must be left to a jury.

## IV. Plaintiff's Equal-Protection Claims

Magistrate Judge Tiscione found that Plaintiff's equal-protection claims failed whether brought under either a selective-enforcement or class-of-one theory. (R&R at 66–69.) *First*, Magistrate Judge Tiscione found that any claim of differential treatment based on Plaintiff's exercise of a First Amendment right would be duplicative of Plaintiff's First Amendment retaliation claims, and therefore improper. (*Id.* at 67–68.) *Second*, Magistrate Judge Tiscione found that, to the extent Plaintiff based such a claim on personal animus against its owner, such a claim was barred by the Supreme Court's decision in *Enquist v. Oregon Dep't of Agric.*, 553 U.S. 591 (2008). (*Id.* at 67–68.) While the Court agrees with Magistrate Judge Tiscione's recommendation that Plaintiff's claim is barred, it does so for a different reason: Plaintiff never asserted any equal-protection claim based on personal animus against its owner.

Plaintiff's complaint does not clearly assert the basis for its equal-protection claim. (*See* TAC ¶¶ 230–38.) Plaintiff's opposition to Defendant's motion for summary judgment, however, makes abundantly clear that its equal-protection claim is based on its protected First Amendment activity and not personal animus against its owner. Plaintiff asserts: "The Defendants took adverse action against Plaintiff (a) because it had spoken out against the City's PPT regulatory scheme, (b) because it commenced litigation against the City, and (c) because it had reserved its rights in the FA which it submitted." (Pl.'s Mem. Law Opp'n Defs.' Mot. Summ. J. ("Opp'n") 19, ECF No. 486.) Indeed, according to Plaintiff: "The *only* difference between Plaintiff and the 80 other PPT providers approved for a franchise was that Plaintiff refused to sign away its First Amendment rights." (*Id.* at 20.) (emphasis added). In other words, Plaintiff has simply repackaged its First Amendment retaliation claims into an equal-protection claim.

Courts in the Second Circuit have dismissed equal-protection claims that merely restate First Amendment retaliation claims. *See, e.g.*, *Whitehead v. City of New York*, 953 F. Supp. 2d 367, 377 (E.D.N.Y. 2012) (dismissing equal protection claim based upon First Amendment retaliation as duplicative of a First Amendment retaliation claim); *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 518 (E.D.N.Y. 2011) (granting summary judgment as to "equal protection claim based upon retaliation for First Amendment activity" because "such a claim is completely duplicative of [a] First Amendment retaliation claim"). The reasoning is simple: courts should not unnecessarily stretch sections of the Constitution to reach wrongs already covered by other sections. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (rejecting due process challenge to false arrest "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct"). Here, the First Amendment provides Plaintiff with an explicit textual source for his alleged constitutional wrongs. Therefore, the Court dismisses Plaintiff's equal-protection claims as duplicative.[15]

## V. *Monell* Claims

Magistrate Judge Tiscione found that Plaintiff had failed to adduce sufficient evidence to support a *Monell* claim with respect to Plaintiff's First Amendment retaliation claim, but had adduced sufficient evidence with respect to Plaintiff's unconstitutional-condition claims. (R&R at 74-78.) Plaintiff raises several objections to Magistrate Judge Tiscione's findings. *First*, Plaintiff contends that any City action to enforce the purportedly unconstitutional condition within the FA necessarily triggers *Monell* liability. (Pl.'s Obj. at 14–15.) *Second*, Plaintiff

---

[15] Notably, Plaintiff did not object to Magistrate Judge Tiscione's recommendation that any equal-protection claim arising from its First Amendment retaliation claims should be dismissed as duplicative and therefore has waived it rights to appeal at least portions of that recommendation.

argues that it should be permitted to argue that the FA's waiver was so important to the City's regulatory scheme that it would not have been left to underlings to enforce. (*Id.* at 15–16.) *Third*, Plaintiff claims that it adduced evidence that policymakers directed the acts of retaliation against Plaintiff. (*Id.* at 16.) *Fourth*, Plaintiff contends that policymakers ratified the retaliation after the fact. (*Id.*) *Fifth*, Plaintiff contends that it has adduced evidence that policymakers delegated authority to those who ultimately took retaliatory action against Plaintiff. (*Id.*)

Plaintiff's first two objections muddle the distinction between its First Amendment retaliation claim and its unconstitutional-condition claim. To the extent that the City maintained a formal policy of including in the FA an unconstitutional condition, and Plaintiff was harmed by such a policy, Plaintiff can demonstrate *Monell* liability. *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("*Monell* established that alleging that a municipal policy or ordinance is itself unconstitutional is always sufficient to establish the necessary causal connection between the municipality and the constitutional deprivation, because an employee's act of enforcing an unconstitutional municipal policy may be considered the act of the municipality itself."). Indeed, Magistrate Judge Tiscione expressly found that Defendants were not entitled to summary judgment with respect to Plaintiff's unconstitutional-condition claim against the City. (R&R at 77–78.) But, to the extent that Plaintiff seeks to impose *Monell* liability against the City for discrete acts of First Amendment retaliation, Plaintiff was required to prove that the City itself was responsible for those discrete acts. As Magistrate Judge Tiscione correctly found, however, Plaintiff failed to adduce evidence that a final policymaker, here Commissioner Dobrin, directed or approved these retaliatory acts. (R&R at 75–76.) Absent such evidence, to permit the imposition of *Monell* liability by inference or implication, would amount to imposing *respondeat superior* liability against the City. *See Amnesty Am.*, 361 F.3d at

125 ("[C]onstitutional torts committed by city employees without official sanction or authority do not typically implicate the municipality in the deprivation of constitutional rights, and therefore the employer-employee relationship is in itself insufficient to establish the necessary causation.").

Plaintiff's claim that it adduced sufficient evidence of Commissioner Dobrin's direct involvement is similarly lacking. Plaintiff cites to the deposition of Defendant Regal as evidence that Commissioner Dobrin and Deputy Commissioner Reiss made the decision to deny Plaintiff's request for an extension to complete the FA. But Regal did not testify with such specificity. Plaintiff's counsel asked: "With respect to Plaintiff Payphones and the positions that, for example, you took in various letters you sent to Plaintiff, who did you take direction from with respect to those decisions." (ECF No. 525-1 at 11.) Regal responded: "As I said, these were group decisions which were made in discussions including myself, Deputy Commissioner Elaine Reiss, who was also general counsel, we would sometimes brief Commissioner Allan Dobrin, Larry Allison who was Assistant Commissioner for pay phones was involved in these decisions . . . some issues, were relatively minor and could be decided at a lower level, some were larger issues and needed to be decided at a higher level." (*Id.*) This statement fails to identify what specific decisions were made by these purported policymakers with respect to Plaintiff or even whether the decision to deny Plaintiff's request for an extension was a "relatively minor issue" that "could be decided at a lower level," or a "larger issue[], that "needed to be decided at a higher level." Therefore, this testimony cannot support *Monell* liability. Plaintiff also claims that Regal's testimony evidenced the fact that a policymaker made the decision not to accept Plaintiff's FA in May 2000. (*Id.* at 28–29.) Within the cited deposition portion, however, Regal states at least three times that he has no recollection of who made that ultimate decision. (*Id.*)

Plaintiff's claim that Dobrin ratified the retaliatory actions against Plaintiff rests almost entirely on dramatic readings of letters sent from Dobrin to Plaintiff.  Specifically, Plaintiff claims that an August 4, 2000 letter from Dobrin in which he informs Plaintiff of the decision to remove its pay phones by stating "[t]his office has . . . concluded that . . . removal of the applicable public pay telephones is an appropriate remedy" proves that Dobrin directed a retaliatory act.  (ECF No. 462-4 at 172.)  While this letter is evidence that Dobrin approved an act, it is not evidence that Dobrin approved a retaliatory act.  "Where . . . liability is premised on the policymaker's approval of a subordinate's unlawful act, it must be shown that the policymaker ratified the subordinate's decision and the basis for it."  *Davis v. City of New York*, 75 F. App'x 827, 829 (2d Cir. 2003).  Therefore, and contrary to Plaintiff's arguments, Plaintiff was required and has failed to adduce evidence that Dobrin ratified the basis for any retaliatory action.  Plaintiff attempts to generate the necessary evidence of retaliation with the use of italics, highlighting the fact that Dobrin "wrote directly to Plaintiff's president[,]" with language such as "*inexplicable refusal over many months* to comply" and "*a continuing contempt* for the City's statutory and regulatory scheme."  (Letter from Dobrin to Plaintiff, Dkt. No. 462-4 at 138 (emphasis added)).  Even drawing every inference in Plaintiff's favor, this language at most evidences a distaste of Plaintiff by Dobrin, not Dobrin's intent to engage in acts of retaliation based on Plaintiff's First Amendment rights.

Plaintiff also suggests that a June 19, 2000 letter in which Dobrin states that "the failure, and indeed the affirmative refusal, by Plaintiff to execute, in anything even remotely related to a timely fashion, the franchise agreement approved by the [FCRC]" suggests that Dobrin participated in an act of retaliation because "Dobrin certainly was aware" of Plaintiff's May 2000 reservation of rights.  (ECF No. 462-4 at 135.)  This would only be true if Plaintiff had actually

adduced evidence that Dobrin was aware of Plaintiff's May 2000 reservation of rights. Absent

such evidence, the June 2000 letter only reflects that Dobrin believed that Plaintiff had refused to

execute the FA, not that Dobrin was aware of the reason that Plaintiff had so refused.

Finally, Plaintiff's argument that Dobrin delegated final policymaking authority to

Regal also fails. (Pl.'s Obj. at 19.) Plaintiff's theory rests on only two pieces of evidence: (1)

the June 19, 2000 letter in which Dobrin stated that the City Law Department was acting "on

behalf of" DoITT, and (2) an affidavit submitted by the City in connection with Plaintiff's

Article 78 proceeding, in which a City attorney stated that "Mr. Regal was representing DoITT

with regard to the franchise matter and was speaking on behalf of DoITT." (*Id.*) This is simply

not enough. The statement that the City Law Department was acting on behalf of a specific City

agency in no way suggests that Dobrin had specifically delegated policymaking authority to

Regal. Nor does Defendant Regal's representation of DoITT with regard to Plaintiff's franchise

application suggest any differently. Indeed, such an argument would similarly hold that any

attorney for any agency possessed final policymaking authority. Ultimately, Plaintiff's argument

is that by permitting Regal to manage Plaintiff's franchise application, Dobrin delegated

policymaking authority. "Simply going along with discretionary decisions made by one's

subordinates, however, is not a delegation to them of the authority to make policy." *City of St.

Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). Therefore, Plaintiff has failed to adduce

sufficient evidence of *Monell* liability with respect to its First Amendment retaliation claims.

## VI.    Plaintiff's Compensatory Damages Claims

Defendants object that Magistrate Judge Tiscione erred in failing to grant Defendants'

request for summary judgment with respect to compensatory damages. (Pl.'s Obj. at 20-21.)

Specifically, Defendants argue that Plaintiff has failed to adduce sufficient evidence to support

its claimed compensatory damages. (*Id.*) In its Rule 26(a)(1) Amended Disclosure, Plaintiff

claimed losses of $2,802,500 calculated as its anticipated valuation compared to the ultimate

price of its asset sale to BAS, $1,000,000 in losses from phones that would have been moved to

the curb, $50,000 in unearned media bonuses for curb phones, $34,000 in losses related to the

removal of its equipment, and $50,000 in franchise rights that it could have sold.  (ECF No. 274-

4.)  Defendants claim that these valuations lack corroboration because they are only supported by

the declaration of Plaintiff's CEO, and are "wildly over-estimated."  (Def.'s Mem. Supp. Mot.

Summ. J. ("Defs.' Mem.") at 36–37, ECF No. 485-7.)  In other words, Defendants concede that

Plaintiff has produced some evidence of damages, but Defendants disagree with the inferences

Plaintiff would like a jury to draw from that evidence.  Under such circumstances, summary

judgment cannot be granted.  *See Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996) ("If

there is any evidence in the record from which a reasonable inference could be drawn in favor of

the non-moving party on a material issue of fact, summary judgment is improper.").

**CONCLUSION**

The Court has reviewed the remainder of the R&R for clear error and, finding none,

adopts Magistrate Judge Tiscione's September 13, 2018 R&R with the modifications noted in

this opinion.  For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED

and Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

Plaintiff's equal-protection claim, and *Monell* claim are dismissed with prejudice.  Following the

parties' briefing of Plaintiff's unconstitutional-condition claim and the Court's disposition of that

claim, the parties will proceed to trial on Plaintiff's First Amendment retaliation claims, and

Plaintiff's Section 1983 conspiracy claim.


SO ORDERED.

Dated: Brooklyn, New York             /s/ LDH                        
       September 27, 2019             LaSHANN DeARCY HALL
                                      United States District Judge